UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JAMES NAPIER,                          )
                                       )
                    Plaintiff,         )
                                       )
            v.                         )        No. 1:19-cv-03556-SEB-MKK
                                       )
ORCHARD SCHOOL FOUNDATION,             )
                                       )
                    Defendant.         )

**ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AND GRANTING IN PART
AND DENYING IN PART DEFENDANT'S MOTION TO STRIKE**

This cause is before the Court on Defendant's Motion for Summary Judgment, [Dkt. 103], filed on August 1, 2022, pursuant to Federal Rule of Civil Procedure 56, and Defendant's Motion to Strike, [Dkt. 124], filed on December 21, 2022. Plaintiff James "Jamie" Napier ("Mr. Napier") has brought this lawsuit against his former employer Orchard School Foundation ("Orchard"), alleging that Orchard violated his Title VII rights under the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and 42 U.S.C. § 1981a, by engaging in reverse sex discrimination and then retaliating against him following the filing of his complaint for discrimination in this case. Orchard denies these allegations based on the uncontroverted material evidence for which summary judgment in its favor is warranted and seeks further relief in its Motion to Strike.

For the reasons detailed below, we GRANT IN PART and DENY IN PART Defendant's Motion to Strike and GRANT Defendant's Motion for Summary Judgment.

## Factual Background

### I.      General Background

Defendant Orchard School Foundation operates The Orchard School, a non-profit and independent school covering early childhood through middle school in Indianapolis, Indiana. Am. Compl. 5; Helvie Aff. ¶ 2. Mr. Napier was first hired by Orchard as a middle school teacher in 1996. Napier Aff. ¶ 5. Mr. Napier left for other employment in 2003 and returned to Orchard in 2016, taking the position of Middle School ("MS") Director. Napier Aff. ¶¶ 12, 21. As MS Director, Mr. Napier's duties included supervising MS teachers and the MS Coordinator, Angela Brothers. Napier Aff. ¶ 22. Dr. Sherri Helvie became Orchard's Head of School ("HOS") on July 1, 2018. Napier Aff. ¶ 48. On March 6, 2019, Dr. Helvie informed Mr. Napier that his employment contract would not be renewed for the 2019-20 school year,  though he was allowed to continue in his position as MS Director until June 30, 2019. Napier Aff. ¶¶ 177, 256.

Two months after the conclusion of his tenure with Orchard, Mr. Napier filed the instant suit on August 21, 2019. Am. Compl. In December 2019, Mr Napier filed a new application to return to his prior position. Following Orchard's rejection of his reapplication for the MS Director position, Mr. Napier filed a second lawsuit on August 31, 2021, alleging that in the rejection of his reapplication, he was retaliated against for engaging in protected activity, in violation of Title VII. The Court has consolidated the two cases into this single cause number. [Dkt. 88.]

## II.    Orchard Prior to 2018

Mr. Napier first taught at Orchard from 1996 to 2003, and returned to Orchard School as MS Director in 2016, after teaching and holding an administrative position at another school. Pl. Ex. 33. Mr. Napier testified that, following his hiring, he spoke to Ms. Brothers who disclosed that there had been an internal debate among staff and perhaps others over his hiring. Napier Dep. 137:12–16. Napier claims that "[Brothers's] story was that those were fairly hot conversations, and a lot of people have very strong feelings about not hiring me for the specific reason that I was simply one more white male coming into the spot." *Id.*

Prior to July 1, 2018, Orchard was led by Dr. Helvie's predecessor, Tom Rosenbluth. Napier Aff. ¶ 23. Alongside Mr. Napier as MS Director, Hal Schwartz held the position of Early Childhood and Elementary School ("EC/ES") Director. *Id.* at 39. Mr. Schwartz was hired as EC/ES Director in 2016. Schwartz Aff. ¶ 2. During that hiring process, Scott Weaver, an Orchard faculty member, expressed his opinions on the candidates, including Mr. Schwartz, in an email to Mr. Rosenbluth, stating that he "oppose[d] the viewpoint that we need a woman because I think it comes by way of imposing a stereotype on the male minority." Pl.'s Ex. 3. Weaver opined that Mr. Schwartz was "[a] risk worth taking [because the] likelihood of getting/retaining young male adults as well spoken, intelligent, humorous/playful, engaging, and warm as him are slim and declining." *Id.*

During 2016, Nick Eble was appointed to the position of Assistant HOS. Eble Aff. ¶ 2. While Mr. Eble was under consideration for that position, Mr. Rosenbluth addressed concerns raised by certain Orchard board members who had asked him to "[s]peak to the

fact that we have two white male division directors and now potentially Nick." Pl.'s Ex. 3.

In response to those concerns, Mr. Rosenbluth explained:

> The search committees for both Division Directors were very representative and were composed of a majority of women and our Diversity Director was on both committees. Additionally, all faculty and parents were given an opportunity to meet and give feedback on all the candidates. We had a diverse pool of candidates in each search and we will continue to broaden our candidate pools going forward. Hal and Jamie were the consensus picks.

Pl.'s Ex. 3.

During Mr. Rosenbluth's tenure as HOS, Mr. Napier was included in meetings of the Senior Administration Team, which consisted of Mr. Rosenbluth, Mr. Eble, and Mr. Schwartz, each a white male. Napier Dep. 49. During meetings of this group, Mr. Eble, among others, on occasion expressed the view that there were "too many white male[s]" in senior leadership positions. *Id.* Mr. Napier stated that he tended to agree with this opinion but did not understand it to mean that the males currently in leadership at the school should or would be fired in favor of women. Napier Dep. 54:25–55:11. During the 2016-17 school year, Mr. Napier received a positive performance evaluation from Mr. Rosenbluth. Pl.'s Ex. 6. No statements to the effect that there were "too many white males" were ever made by Dr. Helvie before or after her arrival as HOS. *Id.* at 55.

In mid-2017, Mr. Rosenbluth was notified by Orchard that his employment contract would not be extended signaling that he would not be returning as HOS following the 2017-18 school year. Napier Dep. 26:11–14. In anticipation of Mr. Rosenbluth's departure, the school undertook a search for the next HOS, which process ultimately led to Dr. Helvie's hiring. *Id.* During the search process, Orchard board members exchanged an email

4

communication conveying the "unsolicited comments" of various Orchard parents indicating that "[w]hen asked about diversity and specifically recruiting a female – response was ….Hard to find a woman -because not head of household….difficult relocation [sic]." Pl. Ex. 7. The email also stated that the school "[n]eed[s] diversity . . . Awarding Nick blocked the situation on what we can do for the HOS…if we want diversity…we need to find a femaile [sic]," referring to the fact that, after Mr. Eble's promotion to administration, all members of the school's top administrative staff were white males. *Id.*

Further, on December 2, 2017, in a conversation between Orchard Board members and its search consultant, Jo Butler, who had been engaged to assist with finding HOS candidates, regarding an interview with a particular candidate who, if hired, would be the fourth white male within the school administration, Butler stated:

> Somehow the "you're a white male and therefore at a huge disadvantage" came through loud and clear. Leaving aside the legality of that position, I think he has another opportunity that has come up, so he is looking for some guidance. . . . Yes, [the candidate] is a white male, but I think part of the challenge at Orchard is the dynamic of the four particular males at the top. My impression is that there is a little frat boy feeling that is going on, in part, due to the sarcastic nature that I observed in Tom and Jamie. I don't think they are very self-aware when it comes to how the four of them huddled together might appear to the predominantly female faculty. I think the right male would get that.

Pl.'s Ex. 7. In response, Dan Appel, an Orchard Board member, replied:

> We did talk about the white male issue in the context of something he would need to address if we selected him. It is an issue he needs to be aware of. We were clear that that was not a determining factor in our selection. His answer on how he would address it was good. Yes the Hal/Jamie issue creates a complicating factor among some of the community.

*Id.* Later, Colleen O'Brien, another Orchard Board member, responded to Butler and Appel as follows:

> As a group I don't think our intention was that it's a disadvantage in the process so much as it would be a disadvantage or a BIG challenge if he got the job moving forward. To me I felt we were pressing the point of the faculty impression and how would you work to overcome the lack of diversity perception if he were chosen. . . . For what it's worth, all three of us were impressed with how he answered regarding facing that challenge – very frank and very positive that he could lead that discussion and affect change.

*Id.*

### III.    Dr. Helvie's Background and Arrival at Orchard

Following completion of the HOS search, Orchard Board members selected Dr. Helvie to lead the school. Dr. Helvie's qualifications included a B.A. from the University of Nevada, Reno, with a major in English and a minor in Women's Studies, an M.A. from the University of Nebraska-Lincoln, with emphases in Women's Literature and Critical Theory and a minor in Classical Greek, and a Ph.D. from the University of California-Santa Cruz in literature, with a degree notation in Women's Studies. Pl.'s Ex. 32. She entered on duty as the HOS on July 1, 2018.

Shortly thereafter, Dr. Helvie sent an email to all Orchard employees describing her activities of her first two weeks at Orchard's helm. Def.'s Ex. D. She reported that she had conducted a meeting with the "Senior Administrative Team," including Mr. Eble, Jennifer Bostrom, Director of Institutional Advancement, and Courtney Williams, Chief Financial Officer, as well as a meeting with the "Academic Leadership Team," including Mr. Eble, Mr. Schwartz, and Mr. Napier. Def.'s Ex. D; Helvie Aff. ¶ 4. Dr. Helvie regarded these officials as comprising the school's leadership structure and as a continuation of the

6

approach under Rosenbluth. Helvie Aff. ¶ 4. Mr. Napier's day-to-day responsibilities and salary did not change following his shift from the "Senior Administrative Team" to the "Academic Leadership Team;" Mr. Napier nonetheless perceived this shift as a demotion, since, as he expressed, he was no longer "in the know" on school decisions and had less access to the HOS. Napier Dep. 32:3–35:3. The Academic Leadership Team met every two weeks, though occasionally meetings were cancelled. *Id.* at 72:11–13.

### IV.   Napier's Discharge

#### a.   Teacher Job Posting

In October 2018, Orchard was informed by an MS English teacher that she intended to retire at the end of the 2018-19 school year. Napier Dep. 61:3–7. Mr. Napier and Ms. Brothers focused their hiring attentions to replace the retiring English teacher on a specific teacher then employed by another school, which candidate Mr. Napier discussed with Dr. Helvie. *Id.* at 64:12–16. During their discussion, Dr. Helvie instructed Mr. Napier not to post the position until he heard back from her in order to allow her an opportunity to speak with the head of the other school. *Id.* Sometime later, when Mr. Napier had not heard back from Dr. Helvie, he directed the Orchard human resources department to post the vacancy. *Id.* at 65:1–19. Mr. Napier believed that in posting the position he was simply beginning the hiring process by creating an applicant pool, since the ultimate hiring decision would be Dr. Helvie's not his. *Id.* at 64:12–25. Within a couple of days of the posting, Dr. Helvie instructed Mr. Eble, who had also become aware of the posting, to take it down. *Id.* at 63:3–5, 65:24–66:3.

### b.  Ms. Brothers's Job Description

Early in Dr. Helvie's tenure as HOS, she undertook discussions with Mr. Napier regarding Ms. Brothers's role as MS Coordinator. *Id.* at 68:5–10. Dr. Helvie was considering whether to retain Ms. Brothers's position as well as the EC/ES Coordinator position then occupied by Gretchen Bricker. Dr. Helvie was reluctant to retain positions based on vague job descriptions. *Id.* at 66:25–67:21. As part of her review, Dr. Helvie requested that Mr. Napier put together a job description for the MS Coordinator position; she made a similar request of Mr. Schwartz regarding Ms. Bricker's position. Napier Dep. at 67:21–68:4; Def.'s Ex. E. These reviews were discussed at leadership meetings attended by Mr. Napier, prompting Dr. Helvie to remind attendees that what was said at the meetings should be kept confidential. Napier Dep. at 90:9–10. Dr. Helvie testified that she directed both Mr. Napier and Mr. Schwartz to keep their proposals confidential. Helvie Aff. ¶ 7. Mr. Schwartz has confirmed that he was specifically told to keep his review confidential. Schwartz Aff. ¶ 6. In contrast, Mr. Napier has testified that he "can't recall her saying this specific thing is of [] uber secrecy." Napier Dep. 90:11–12.

Around January or February 2019, Ms. Brothers began to develop concerns that her job was in jeopardy, prompting her to ask Mr. Napier whether "there's something up." *Id.* at 82:21–22. Mr. Napier reportedly responded to her inquiry saying, "if and maybe possibly." *Id.* at 82:24–25. He also discussed with her the job description he was crafting for her position, viewing their discussion as permissible because, in his mind, any secrecy regarding his review project had already been breached and was "water under the bridge." *Id.* at 90:17–18. Following their discussion, Ms. Brothers asked Mr. Napier for his advice

on whether she could discuss these pending changes with Dr. Helvie; Mr. Napier did not object. *Id.* at 83:14–17.

Ms. Brothers and Dr. Helvie met soon thereafter, on February 20, 2019. Def.'s Ex. O. During their meeting, Dr. Helvie confirmed that Ms. Brothers's job was, indeed, under review for possible elimination, making it likely that she would need to return to teaching if she remained employed at Orchard. Hearing this news, Ms. Brothers became understandably upset. Def.'s Ex. O; Bricker Aff. ¶ 38. Near the same time, Ms. Bricker became aware that her position with the school was also at risk, prompting her to approach Mr. Schwartz to discuss the issue. Bricker Aff. ¶ 38. On February 22, 2019, Dr. Helvie expressed to members of Orchard's governing boards her opinion that Mr. Napier's breach of confidentiality in his conversations with Ms. Brothers had "egregiously compromised [her] trust in him." Def.'s Ex. O.

### c.  March 6, 2019 Meeting and Resulting Email

On March 6, 2019, Dr. Helvie met with Mr. Napier (Orchard's HR Coordinator Stephanie Meiss was also in attendance) to inform Mr. Napier that his employment contract would not be renewed for the 2019-20 school year. Napier Dep. 93:6–18, 94:23–24. Dr. Helvie explained that she had lost trust in him, based on his having shared with Ms. Brothers the information related to his review of her position, which disclosure had caused both Ms. Brothers and Ms. Bricker considerable distress. *Id.* at 94:20–23. Dr. Helvie also stated that she would soon inform the school staff via email of her decision on Mr. Napier's termination and invited him to add his own contributions to the email notification. *Id.* at 96:7–10. Later that same afternoon, Dr. Helvie offered Ms. Brothers the position of Acting

MS Director. *Id.* at 95:24–96:1. Ms. Brothers then consulted with Mr. Napier, seeking his advice as to whether she should accept the position, and Mr. Napier encouraged her to take the job, which she ultimately accepted. *Id.* at 100:15–25.

On March 8, 2019, Mr. Napier met with Dr. Helvie and HR Coordinator Meiss a second time. *Id.* at 101:19–24. Mr. Napier had opted not to contribute to the email notice to the staff that his contract would not be renewed, choosing instead to maintain his opposition to and displeasure with the nonrenewal decision. *Id.* at 101:25–102:4. At 4:34 that same afternoon, Dr. Helvie sent out the email to Orchard staff informing them that Mr. Napier would not be returning the following year and that he would be staying on for the remainder of the current school year. She also expressed her appreciation for his work at Orchard and wished him luck in his future pursuits in the field of education. Pl.'s Ex 21. The email also informed staff that Ms. Brothers would be taking over Mr. Napier's MS Director position on an interim basis. *Id.* Mr. Napier was informed by Ms. Meiss that the purpose of the email to the Orchard staff was to inform them of changes so they would know prior to their own decision-making regarding the renewal of their contracts for the next school year. Napier Dep. 104:16-23. Mr. Eble was not involved in the meeting between Dr. Helvie and Mr. Napier regarding his termination nor did he play any other part in the decision-making process regarding Mr. Napier's employment. Eble Dep. 15:4-5. Dr. Helvie never disclosed to Mr. Eble any specific reason for Mr. Napier's discharge but did tell him that "she felt that their relationship was not going to be conducive to the school moving forward." Eble Dep. 15:16-21.

V.      **Events Following Napier's Discharge**

Approximately one week after the email notice to staff was sent out, Mr. Napier sent his own letter to Orchard Board members detailing his grievances against Dr. Helvie. Pl.'s Ex. 25. Following their receipt of the news of his termination, numerous Orchard parents and faculty members sent statements of support to Mr. Napier, as well as thanks for his service. Pl.'s Ex. 23; Pl.'s Ex. 24. Certain Orchard faculty members joined in sending a letter to Orchard Board members to express their concerns over Mr. Napier's firing and to request a meeting with board members. Pl.'s Ex. 22. One faculty member decided not to return to Orchard allegedly due to Mr. Napier's firing. Meiss Dep. 35:7–13. During the days following the issuance of the notice of Mr. Napier's nonrenewal, Dr. Helvie conducted various meetings with Orchard faculty and parents to reassure them that Mr. Napier was not terminated for any illegal or untoward behavior, though she did not disclose in those sessions any specific reasons for her action. Helvie Dep. 38:25–42:19. On March 11, 2019, Dr. Helvie and Mr. Schwartz notified Ms. Bricker that her position was going to be eliminated as well and that, in order for her to remain employed by Orchard, she would need to accept a teaching position. Bricker Aff. ¶ 43. Ms. Bricker opted not to do so, thus also declining to enter into an employment contract with Orchard for the 2019-20 school year. Bricker Aff. ¶ 49.

Mr. Napier filed this lawsuit on August 21, 2019, following receipt of a right to sue notice from the Equal Employment Opportunity Commission ("EEOC") on May 28, 2019. Am. Compl. Seven months later, on December 9, 2019, Mr. Napier submitted to Orchard an application to return to the position of MS Director. Pl.'s Ex. 33. Mr. Eble received and

processed that application, rejecting it as he did another application by another former Orchard employee, both on the basis of their "poor past performance." Eble Aff. ¶¶ 4–7. Sometime thereafter, Mr. Eble offered the permanent MS Director position to Ms. Brothers, who had up until then been serving in an acting capacity. *Id.* at ¶ 8. On January 29, 2020, Orchard informed Mr. Napier that his application had been rejected. Pl.'s Ex. 33. That rejection prompted Mr. Napier to file a second charge of discrimination with the EEOC based on his failure to be rehired. He received a right to sue notice from the EEOC on that claim on June 3, 2021. On August 31, 2021, he filed a separate, second lawsuit challenging Orchard's failure to rehire him. On September 21, 2021, Mr. Napier's separate lawsuits were consolidated by the court under the above cause number. Later, he amended his complaint to incorporate all his claims into a single pleading. Am. Compl. The claims raised in his amended complaint are now the subject of Orchard's pending motions, which we address below.

### Legal Standard

Summary judgment is appropriate where there are no genuine disputes of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them

in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

In employment discrimination cases, the summary judgment standard is applied rigorously "because intent and credibility are such critical issues and direct evidence is rarely available." *Howard v. Indianapolis Pub. Sch.*, No. 1:13-cv-02039-SEB-TAB, 2017 WL 1165497, at *7 (S.D. Ind. Mar. 29, 2017), *aff'd*, 727 F. App'x 198 (7th Cir. 2018) (citations omitted). To that end, we carefully review affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination. However, our Seventh Circuit has made clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts. *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997). We find based on our careful review of the submissions by the parties that  no genuine disputes exist as to any material facts that would foreclose a summary ruling.

## Discussion

### I.    Defendant's Motion to Strike Plaintiff's Surreply

We turn first to resolve Defendant's Motion to Strike Plaintiff's Surreply Brief. [Dkt. 124.] Orchard contends that Mr. Napier's surreply brief was improperly filed under Local Rule 56-1(d), which allows "[a] party opposing a summary judgment motion [to] file a surreply brief only if the movant cites new evidence in the reply or objects to the admissibility of the evidence cited in the response." Orchard concedes that it included some references constituting new evidence in its reply and that certain objections were also

interposed in that response brief, such that a surreply limited to those points is permissible. However, Orchard seeks to strike those portions of the surreply brief that do not conform to Rule 56-1(d), which limits surreply briefs only to "new evidence and objections."

The "purpose for having a motion, response, and reply is to give the movant the final opportunity to be heard and to rebut the non-movant's response, thereby persuading the court that the movant is entitled to the relief requested by the motion." *Lady Di's, Inc. v. Enhanced Servs. Billing, Inc.*, 2010 U.S. Dist. LEXIS 29463, at *4 (S.D. Ind. Mar. 25, 2010). "Courts allow a surreply brief only in limited circumstances to address new arguments or evidence raised in the reply brief or objections to the admissibility of the evidence cited in the response." *Lawrenceburg Power, LLC v. Lawrenceburg Mun. Utilities*, 410 F. Supp. 3d 943, 949 (S.D. Ind. 2019).

Our review of Mr. Napier's surreply brief confirms Orchard's claim that the tendered brief exceeds the allowable parameters of the Rule. Only five sentences of Mr. Napier's twenty-page brief, in fact, address Orchard's "new evidence." [Dkt. 123 at 8, 14–15, 20.] Of the remaining portions of the brief, only a small part addresses Defendant's objections, repeating instead arguments previously set out in his Response Brief. Remarkably, in his ten-page Response to Orchard's three-page Motion to Strike [Dkt. 125], Mr. Napier's focus is primarily on rehashing arguments he advanced in prior briefs, barely mentioning any specific grounds justifying its filing.

Accordingly, the Court will strike those sections of the Plaintiff's Surreply [Dkt. 123] and the Plaintiff's Response to Defendant's Motion to Strike [Dkt. 125] that simply repeat and rehash prior arguments against summary judgment. The portions of the surreply

that address the new evidence first cited in Defendant's reply brief will not be stricken and will be considered in our forthcoming analysis.

For the foregoing reasons, the Defendant's Motion to Strike is <u>GRANTED IN PART</u> and <u>DENIED IN PART</u>.

## II.   Defendant's Motion for Summary Judgment

### a.  Gender Discrimination Claim

#### i.  *McDonnell Douglas* Framework

Although Mr. Napier requests that we examine his claims under the approach in *Ortiz v. Werner Enterprises Inc.*, which directs lower courts in Title VII discrimination cases to examine all the evidence as a whole, 834 F.3d 760, 765 (7th Cir. 2016), he has elected to structure his brief and supportive arguments under the *McDonnell Douglas* burden-shifting framework. We therefore will conduct our review of Mr. Napier's claim under both analytical frameworks. We begin by examining plaintiff's prima facie claim of discrimination under *McDonnell Douglas*, after which we shall turn to the *Ortiz* standard.

Under the *McDonnell Douglas* burden-shifting framework, to survive summary judgment, the plaintiff in a reverse discrimination case must establish the following four elements to constitute a prima facie case: (1) "'background circumstances' that demonstrate that a particular employer has 'reason or inclination to discriminate invidiously against [men]' or evidence that 'there is something "fishy" about the facts at hand'"; (2) he was performing his job up to his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly-situated individuals who are not men. *Phelan v. City of Chicago*, 347 F.3d 679, 684–85 (7th Cir.

2003) (quoting *Mills v. Health Care Service Corp.*, 171 F.3d 450, 457 (7th Cir.1999)). "If the plaintiff satisfies his initial burden, the burden shifts to the defendant to present a legitimate, nondiscriminatory reason for the decision." *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007). "If the defendant does so, the burden returns to the plaintiff to show that the defendant's explanation was pretextual." *Id.* Applying the *McDonnell Douglas* analysis, we conclude that Mr. Napier has failed to overcome his burden to establish a prima facie case of discrimination.

## A. Background or "Fishy" circumstances

The first element of the plaintiff's prima facie case requires him to show that his employer was "the unusual employer who discriminates against majority employees." *Mills*, 171 F.3d at 457. Stated otherwise, the plaintiff must demonstrate that there are background or "fishy circumstances" which, even if "far from actual evidence of discrimination, are enough to overcome the background presumption that a [] man was not subject to employment discrimination." *Id.* (analyzing a reverse race discrimination case).

In his Response Brief, Mr. Napier lists forty-three allegedly "fishy" circumstances which constitute the requisite background circumstances in his case. Pl.'s Resp. at 13–17. A close examination of each of the items on that list, however, discloses that many of the facts cited there bear no relation to the issue of whether Orchard was an employer inclined to discriminate against men; as to those bearing no such relationship we will not discuss further. [1] The remainder of the list of 43 "fishy circumstances," following our careful

---

[1] For example, we are at a loss to understand how the alleged fact that "Napier and his wife have two teenage daughters" tends to show that Orchard had a reason or inclination to discriminate against men. Pl.'s Resp. at 13 ¶ 5.

review, do not, together or individually, constitute background circumstances of the sort that suggest, never mind clearly show, that Orchard held an employment bias against men, as we explicated more fully below. Mr. Napier has included in his argument four issues of allegedly disputed fact. *Id.* at 17–18. However, none of these issues of allegedly disputed fact pertains to any *material* fact; similarly, none, together or individually, reveals any basis for establishing that Orchard is the unusual employer who discriminated against men.

We undertake our analysis of Mr. Napier's specific "fishy background circumstances" in detail in the ensuing paragraphs, beginning with the claim that the timing of his termination—a mere nine months following Dr. Helvie arrival on duty as Orchard's HOS—was suggestive, along with the fact that her termination decision was based on "vague false reasons." Pl.'s Resp. at 14 ¶ 10. Initially, we note that this argument is weakened by putting the cart before the horse, because it requires a finding (or at least an assumption) that he was terminated for a discriminatory reason in order to find that Orchard is likely to discriminate. Although at summary judgment all reasonable inferences are to be drawn in a way most favorable to the non-moving party, the plaintiff still has the burden of establishing a prima facie case, and we simply cannot adopt the proffered conclusion without some evidence to support it.

There is no support for a finding that Mr. Napier's termination was itself a fishy circumstance. Even assuming that suspicious timing of a termination can sometimes serve as such a fishy background circumstances, Mr. Napier's firing, which occurred nine months

---

We are similarly unpersuaded that the information contained in paragraphs 1–4, 6–9. 11–12, 18–20, and 29 is in any way relevant to this determination.

after Dr. Helvie was hired, is far too remote in time to be deemed suspicious, since it was sufficient to allow her an opportunity to work and interact with Mr. Napier and provide and experiential base for making management decisions. Nothing before us supports the conclusion that this timing of her decision(s) serves as proof of Orchard's penchant for discriminating against men. Thus, we hold that the timing of his firing does not constitute a "fishy" background circumstance sufficient to establish the first element of Mr. Napier's prima facie case.

Secondly, Mr. Napier maintains that there exists an industry-wide pattern of discrimination against men within the fields of elementary and middle school education. Pl.'s Resp. at 14 ¶ 13. Mr. Napier adduces no evidentiary support for this theory, either in the caselaw or otherwise. No judicial opinion to our knowledge recognizes that, in certain industries, a reverse discrimination plaintiff is relieved of his burden of establishing a prima facie case based on the specific identity of his employer or vocational sector. In any event, plaintiff has put forward no evidence establishing such a pattern of discrimination in the field of elementary and high school level education, citing instead only his own deposition testimony as support for this claim. Because there is no evidentiary support for his claim, showing either that industry-wide discrimination against men within the field of education exists or that, if it did, it existed at Orchard and constituted a fishy background circumstance, we reject Plaintiff's theory/contention that on this basis the Court could conclude that Orchard specifically discriminates against men.

Next, Mr. Napier cites an array of comments purportedly made by Orchard administrators and board members evincing discriminatory tendencies against men as

background circumstances that counter the assumption that employers do not discriminate against men. Pl.'s Resp. at 15 ¶¶ 22–25. These comments include the following: the alleged debate that was generated by Mr. Napier's initial hiring over whether, as a man, he should have been hired as MS Director; comments from certain board members to Mr. Rosenbluth regarding diversity when Mr. Eble was promoted to Assistant HOS; statements by Mr. Eble and others expressing the view that there were "too many males" in Orchard's administration; the email communication between/among board members discussing the desire on the part of some Orchard parents to find a female HOS; and Orchard board members Butler, Appel, and O'Brien's discussion of the interview with an HOS candidate. *Id.* While evidence that such statements from board members, parents, or other administrators influenced or pressured Dr. Helvie into favoring the hiring of women over men could constitute a "fishy circumstance," here that evidence falls short of the intended mark. It turns out that each of these statements was made *prior* to Dr. Helvie's arrival on duty at Orchard. No evidence has been adduced that shows she was ever made aware of or told about these statements or the underlying sentiments. Without a time or causal connection between Dr. Helvie, who made the decision on Mr. Napier's nonrenewal of his employment contract, and these statements or views, they simply do not qualify as fishy, background circumstances.

Mr. Napier also argues that Dr. Helvie's own educational background constitutes a "fishy circumstance" indicating that Orchard, under her leadership, is inclined to discriminate against men, in terms of the "vibe" that she created at the school, of the placement of women in administrative positions they had not previously held, and of

statements made and views held by various others at the school. Pl.'s Resp. at 15 ¶¶ 26–28, 19. Orchard argues that Mr. Napier's argument is a nonstarter, because, taken to its extreme, it suggests that any employer/decisionmaker, whose personal academic studies focused on a particular subgroup of society, would likely discriminate in favor of that group in the course of performing his or her responsibilities. Def.'s Br. at 18. More critical, as Orchard argues, is the fact that Mr. Napier has failed to cite any evidence to show that Dr. Helvie's educational background ever did, in fact, influence her employment decisions. Def.'s Reply Br. at 11.

We decline to find that Dr. Helvie's personal educational attainments in the field of women's studies constitutes a fishy circumstance. To begin with, Dr. Helvie's educational pursuits were undertaken nearly two decades prior to the events at issue here. In addition, assuming they represent a biased view in favor of women, which we refuse to assent to, they have not been shown to have any connection to any statements made by other Orchard administrators or board members or any administrative hiring decisions made by Dr. Helvie. Based on the evidence, no "vibe" has been shown to have existed at Orchard emanating from Dr. Helvie's education or area of academic interest/expertise. If any reasonable inference could be reliably drawn from her educational background in gender studies, it would more likely be an aversion to any form of gender discrimination. *See e.g.,* Wellesley College, Women's and Gender Studies, https://www.wellesley.edu/wgst (last visited February 10, 2023) (promoting Wellesley College's Women's and Gender Studies Department's "focus[] on gendered stereotypes and how to look past them."). We thus hold

that Dr. Helvie's undergraduate and graduate studies do not constitute a "fishy background circumstance" that could show that Orchard discriminates in hiring against men.

Continuing with Mr. Napier's claims, he maintains that the background circumstances surrounding his firing are themselves fishy, because, rather than investigate the various complaints about his termination, as raised by parents and faculty members and as consistent with the allegations he included in his EEOC charge, Orchard's board both ignored those complaints and voted to award Dr. Helvie an increase in salary. Pl.'s Resp. at 16 ¶¶ 31–35. We perceive nothing fishy about these circumstances. Each of these complaints arose following the disclosure of the school's decision to terminate Mr. Napier, not prior to it. Reactions of some of the parents and faculty are not necessarily relevant indicators of the reasons behind the decision usually due to the fact that the people making them were not engaged in the decision or even informed of the reasons for the firing. Thus, such reactions cannot be imputed to the Orchard administration. Further, the Board's failure to directly engage with Mr. Napier following the termination decision and its decision to give Dr. Helvie a raise do not provide evidence that her decisions against Mr. Napier were discriminatory; indeed, they simply reveal the board's support for Dr. Helvie's decisions.

Mr. Napier also contends that shortcomings in Orchard's personnel policies and Orchard's failure to follow its policies together raise a likelihood that Orchard discriminates against men. He notes that Orchard's policies did not include a prohibition against sex discrimination, and that the multiple references that were included in Orchard employment policies espousing an "Open Door Policy" "requiring an effort to resolve issues before termination" as well as a policy allowing complaints to be lodged with the board were not

followed by Orchard. As a result, he was effectively prohibited from being able to appeal his termination to the Board. Pl.'s Resp. at 16 ¶¶ 38–40.

Neither of these issues in our view raises "fishy circumstances." First, Orchard did have a policy prohibiting employment discrimination based on "gender," Pl.'s Ex. P 25, which mirrored Mr. Napier's complaint for "gender discrimination." Am. Compl. at 7. Secondly, Mr. Napier's argument that he was prevented from lodging an appeal because there was no one for him to appeal his discharge to, because of unenforced personnel policies, does not, by itself, provide proof that Orchard pursued and enforced discriminatory policies. Assuming Mr. Napier or another employee might desire to challenge a supervisor's employment decisions but was unable to do so, it is more likely that the absence of such a process constituted flawed employment practices, rather than a discriminatory practice targeting males. Even assuming deficient personnel policies were in place at Orchard and that they were not always followed, suggesting ad hoc decision-making, standing alone this does not constitute a "fishy background circumstance" that suggests Orchard discriminates against male employees.

Mr. Napier cites various other background circumstances, i.e., that Ms. Brothers and Dr. Helvie, as women similarly situated in the workplace, were treated better than he was. Pl.'s Resp. at 16 ¶ 41. In advancing this argument, he conflates two elements by contending that similarly-situated women who were treated more favorably constitutes a fishy background circumstance. We reject this argument for reasons as more fully explained below.

Mr. Napier puts forward as an additional fishy background circumstance the fact that over a two-year period, from 2020 to 2021, the entire leadership team at Orchard, with the exception of Mr. Eble, was comprised only of women. Pl.'s Resp. at 16 ¶ 41. While arguably replacing an all-male staff with an all-female staff could serve as a fishy background circumstance sufficient to overcome the presumption that an employer would not discriminate against the majority, we see no evidence to support that theory here.

In *Mills*, the Seventh Circuit determined that this element had been satisfied in a reverse sex discrimination case where, over a seven-year period, "nearly all promotions at the office went to women, and at the time the challenged hiring decision was made, females dominated the supervisory positions." 171 F.3d at 457. However important distinctions exist between the facts of this case at bar and those in *Mills*. Although an all-male administrative staff (from the time of Mr. Napier's hiring in 2016 to his termination in 2019) was replaced by an almost entirely female staff (Mr. Eble being the exception), within a very short period of time, two men were hired onto the Orchard leadership team. Pl.'s Ex. 35; Def's Reply at 9. Over a six-year period, the Orchard administration progressed from all-male, to nearly all-female, to a more balanced array. This overall pattern is clearly unlike the hiring pattern in *Mills*. This pattern of hiring falls short of being a fishy background circumstance that shows that Orchard is the unusual employer who favors women over men employees. Arguably, it more clearly demonstrates an ongoing pattern and practice of hiring the best qualified people, without regard to their gender[2].

---

[2] In addition, at the time of Mr. Napier's firing, it was men, not women, who dominated the supervisory positions at Orchard—another distinction from *Mills*.

Mr. Napier has pointed to the hiring of an allegedly unqualified woman as the school's HR Coordinator as evidence of fishy background circumstances. Pl.'s Resp. at 16 ¶ 42. We reject this description of Crystal Lax's hiring as HR Coordinator as "fishy." Mr. Napier attempts to buttress his description and characterization by referencing a print-out of a LinkedIn page tied to the name Crystal Lax, without producing any evidence that establishes that the LinkedIn page actually pertains to the same individual employed by Orchard. Orchard introduced an affidavit from its HR Coordinator denying any connection between its employee and the LinkedIn profile. Pl.'s Ex. 39; Lax Aff. Even if the Court refused to credit the affidavit in this summary judgment context, the print-out of the profile itself fails to establish that Ms. Lax is or was unqualified to serve as the HR Coordinator. Further, there is no evidence validating the reliability of the LinkedIn page as current or accurate in reference to Ms. Lax's qualifications. Thus, no fishy background circumstance arises from Orchard's decision to hire Ms. Lax.

Finally, Mr. Napier claims that reductions in responsibilities for positions occupied by men and corresponding increases in responsibilities for positions occupied by women is a fishy circumstance that suggests Orchard discriminates against men. As support for this contention, Mr. Napier argues that, prior to Dr. Helvie's hiring, the HOS (Mr. Rosenbluth), Assistant HOS (Mr. Eble), and the Division Directors (Mr. Napier and Mr. Schwartz) were all members of the senior administrative team. Following Dr. Helvie's arrival on duty, the division directors were replaced by the Director of Institutional Advancement (Jennifer Bostrom) and the Chief Financial Officer (Courtney Williams). The four positions that previously constituted the senior administrative team were

thereafter organized into the Academic Leadership Team. Recognizing our obligation at this juncture to view the facts in a light most favorable to the non-moving party, it is not lost on us that in doing so the Academic Leadership Team was hardly relegated to insignificance, since it, too, met with Dr. Helvie every two weeks, and Mr. Napier participated in those sessions. Mr. Napier has conceded that neither his day-to-day duties nor his pay were reduced following his removal as a member of the Senior Administrative Team, indeed, the only change in his job description was that, according to his personal assessments, he was no longer "in the know" about certain school decisions.

Plaintiff has failed to adduce evidence giving rise to any issues of material fact with regard to any reductions in job responsibilities for positions occupied by males at Orchard. Mr. Napier was retained on the Academic Leadership Team, and his responsibilities mirrored in major respects those he performed under Mr. Rosenbluth, when the senior team included the HOS, Assistant HOS, MS Director, and EC/ES Director. Despite the name change for this group, Mr. Napier had virtually the same access to the HOS as before Dr. Helvie arrived at Orchard. His vague (some might describe them as whiney) complaints that he was no longer "in the know" is unavailing in the face of uncontroverted evidence showing that he continued to play a meaningful role in the meetings of the management group that was comprised of the same participants as before Dr. Helvie took over.

In any event, no evidence has been adduced to show that Dr. Helvie was even aware that this organizational structure had, in fact, been changed. Dr. Helvie testified that she believed that she had inherited this structure established by her predecessor, Mr. Rosenbluth. To prove that Orchard discriminates against men, Mr. Napier is not required

to show that Dr. Helvie demoted him (as well as Mr. Schwartz) solely because they were men, but he must at least show that she was aware of the change in their roles at the school. Lacking that, the claim that she re-organized or shuffled the leadership teams, assuming she did so herself, fails to demonstrate that Dr. Helvie was inclined to discriminate against men.

For all the foregoing reasons, the Court holds that Mr. Napier's efforts to demonstrate that the requisite background or "fishy" circumstances in this case come up well short of the mark.

### B.      Meeting Employer's Legitimate Expectations

Mr. Napier's efforts to demonstrate the second element of his *prima facie* case, to wit, that he was meeting his employer's legitimate job expectations at the time of his termination, also fall short. He contends, based on the evidence, that he was meeting all of Orchard's legitimate expectations, citing his positive performance evaluations by prior supervisors as well as supportive messages from parents and teachers following his termination. Pl.'s Ex. 23; Pl.'s Ex. 24; Pl.'s Ex. 25. Orchard, on the other hand, cites evidence showing that Mr. Napier, in disobeying Dr. Helvie's instructions twice within a matter of a few months, eroded her trust. Despite what likely was his prior record of exemplary performance, he failed to meet his employer's reasonable expectations that he maintain job related confidences and follow the instructions of his supervisors.

Based on our careful review of the uncontroverted evidence, we hold that Mr. Napier has failed to create a genuine issue of material fact regarding whether he was meeting Orchard's employment expectations. In *Haley v. Urb. Outfitters*, 2023 WL

1775670 (7th Cir. Feb. 6, 2023), the Seventh Circuit analyzed whether a reverse sex discrimination plaintiff had met his burden with regard to this element, noting that the plaintiff had shown that during the years prior to his termination, he had received positive feedback from his employer in a performance review. *Id.* at 2. There, the court relied on "evidence in the record support[ing] Urban Outfitters' assertions that Haley's managers had honestly held beliefs that Haley did not perform his duties satisfactorily." *Id.* at 3. The record included complaints about Haley's work even where Haley disputed the substance of the complaints. *Id.* Thus, the Court of Appeals ruled that "[i]t is not the court's task, … to evaluate whether the employer's purported reason for the adverse employment action was correct, justified, or even if it was fair. We look only to see if the employer honestly believed those reasons." *Id.*

In similar fashion here, despite Mr. Napier's disagreement with the underlying allegations regarding his job performance, he has failed to adduce evidence to show that Dr. Helvie did not honestly believe her stated reasons for discharging Mr. Napier, to wit, his breach of her trust and confidences. Mr. Napier characterizes Dr. Helvie's proffered non-discriminatory reason for his termination as "a vague statement that Napier was told not to talk to his coordinator about her job duties, which is false and makes no sense." Pl.'s Resp. at 20. But we do not find this reason to be vague or nonsensical. It references two specific incidences of his failing to maintain the confidences entrusted to him by his employer. To establish that her reason was "false," Mr. Napier cites only his own deposition and affidavit. *Id.* We do not decide in the current context whether her reasoning was flawed or unconvincing to Mr. Napier, only whether Dr. Helvie's views were honestly

held, and there is no evidence in this record before us to that effect that overcomes Dr. Helvie's veracity.

Mr. Napier also maintains that there is a genuine dispute between the parties as to whether he violated Dr. Helvie's instructions regarding the public posting of the MS teaching position. However, he concedes that he was instructed not to post the position until Dr. Helvie had spoken to the head of the other school, and that, despite his not having heard back from Dr. Helvie, he posted the position anyway[3]. Whatever reason he may have had for believing his posting would not cause serious concerns, it is clear from the evidence—and, indeed, he concedes—that he violated Dr. Helvie's instructions. His equivocations by which he argues that he understood the instructions only to prohibit him from hiring the other teacher, rather than from posting the job vacancy, lack persuasive force because he further concedes that Dr. Helvie, not himself, possessed the authority to hire new employees. No evidence supports the conclusion that Dr. Helvie instructed him not to do something he lacked the authority to do in any event. Having failed to show that Dr. Helvie did not honestly believe her stated reason for discharging him, Mr. Napier has not satisfied this element of his prima facie case.

## C.    Adverse Employment Action

The third element of plaintiff's prima facie case requires him to show that he suffered an adverse employment action. We can quickly dispense with a discussion of this issue since there is no dispute between the parties that the decision not to renew Mr.

---

[3] Mr. Napier attempts to claim that he did not actually post the position, because it was HR who did so. This argument fails because he concedes that he was the one who instructed HR to do so.

Napier's employment contract constituted an adverse employment action. He has thus satisfied this element.

### D.   Similarly Situated Women

Finally, Mr. Napier must show as part of his prima facie case that women similarly situated to him were treated more favorably than he was with regard to his termination. Mr. Napier has identified five (5) women, whom he claims, as Orchard employees or administrators, were given better treatment than he was accorded: 1) Jennifer Bostrom, 2) Courtney Williams, 3) Dr. Helvie, 4) Angela Brothers, and 5) Gretchen Bricker. Mr. Napier maintains that Ms. Bostrom and Ms. Williams were treated more favorably when they were promoted to membership on the Senior Administrative Team at the same time he was "demoted" from the group. Pl.'s Resp. at 16 ¶ 41. He further contends that Dr. Helvie, herself, was able to retain her HOS position without incurring any Board investigation or Board-imposed discipline after she lied about and discriminated against Mr. Napier. Pl.'s Resp. at 16 ¶ 41. He further argues that Ms. Brothers was promoted to succeed him in his position without having even applied for the job and despite being significantly less qualified than he was. Pl.'s Resp. at 16 ¶ 41, 24. Finally, Mr. Napier contends that Ms. Bricker was treated worse than he, citing her own affidavit to that effect. Bricker Aff. ¶ 67.

Our review brings us to the conclusion that the cited instances and related evidence do not support a finding that any one of these women was both similarly situated to Mr. Napier and received more favorable treatment. "A similarly situated employee is one who is directly comparable to the plaintiff in all material respects." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 791 (7th Cir. 2007) (citation and quotation marks omitted).

In assessing whether employees are similarly situated, "[i]n the usual case a plaintiff must at least show that the comparators (1) 'dealt with the same supervisor,' (2) 'were subject to the same standards,' and (3) 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)).

Without evidence that Bostrom's and Williams's placement on the Senior Administrative Team conferred greater authority on them within the workplace, or a change in responsibilities, or higher pay, there is no basis on which to conclude that they were treated more favorably than Mr. Napier. His continued participation in leadership by serving as a member of the Academic Leadership Team did not disadvantage him or diminish his standing. Moreover, Ms. Bostrom and Ms. Williams both had responsibilities separate and distinct from Mr. Napier's academic responsibilities, which differences make them poor comparators in this context. Neither engaged in conduct or incurred any discipline comparable to that experienced by Mr. Napier that resulted in a loss of trust in them by Dr. Helvie. The fact that Dr. Helvie placed Ms. Bostrom and Ms. Williams on the Senior Administrative Team does not raise an inference of discrimination against Mr. Napier.

Dr. Helvie, herself, is also not well situated as a comparator to Mr. Napier. First, Dr. Helvie was Mr. Napier's supervisor, which is a highly probative distinction between them. *See Ellis v. United Parcel Service, Inc.*, 523 F.3d 823, 826 (7th Cir.) ("[T]o be similarly situated, a manager must have been treated more favorably by the same decisionmaker that

fired the [plaintiff]."). More problematic is Mr. Napier's assertion that he was treated less favorably than Dr. Helvie because she was neither investigated nor disciplined after she made the discriminatory decision to terminate him. This argument invites the assumption that Dr. Helvie's discrimination against him provides a basis for his prima facie case of discrimination. This is a clear distortion of the analytical template applicable here. Mr. Napier claims that his supervisor, Dr. Helvie, treated herself more favorably than she treated him, which is silly since, clearly, Dr. Helvie did not (and would not) fire herself for any discrimination she might have committed against him. Dr. Helvie is not and cannot be regarded as a similarly situated female Orchard employee who received better treatment compared to Plaintiff.

Similarly, Ms. Brothers is a poor comparator to Mr. Napier. Unlike Mr. Napier, there is no evidence that she failed to follow explicit directions from her superior or that she revealed job related confidences in a manner that might cause her supervisor to deem her untrustworthy. As such, she is not similarly situated to Mr. Napier and her selection to replace Mr. Napier as the MS Director, following the failure to renew his contract, is insufficient to raise an inference of discrimination. Mr. Napier also proffers that a comparison of the respective qualifications of himself and Ms. Brothers shows that she was not qualified to occupy the position he had previously held. While Mr. Napier clearly possessed significantly more school-related administrative experience than did Ms. Brothers, she herself had acquired two decades of experience at Orchard as both a teacher and a department coordinator. Def.'s Ex H. Mr. Napier's contention that based on his opinion Ms. Brothers was temperamentally unfit for the job is irrelevant. Pl. Resp. at 27.

As we have noted previously, the Court "does not sit as a super-personnel department that reexamines an entity's business decisions." *Debs v. Ne. Illinois Univ.*, 153 F.3d 390, 396 (7th Cir. 1998). A reasonable employer could conclude that Ms. Brothers, who had two decades of teaching and other experience at Orchard, was a well-qualified candidate— indeed, the better choice—for MS Director over Mr. Napier, especially since the reason for his termination did not reflect a lack of experience, rather the loss of trust of Orchard's HOS.[4] We decline to probe further into the details of their respective qualifications in the fashion of a "super-personnel department."

Finally, it is unclear how Ms. Bricker is a similarly-situated woman who received better treatment compared to Mr. Napier. By our assessment, she also is a poor comparator, given that she had a different supervisor than Mr. Napier (reporting to Mr. Schwartz) and had not engaged in misconduct similar to that by Mr. Napier. In addition, there simply is no evidence adduced here that she was treated more favorably than Mr. Napier. Ms. Bricker, like Ms. Brothers, held a position that was in fact placed under review for possible elimination. Ms. Bricker ultimately chose to leave her employment with Orchard, declining to accept a demotion to classroom teaching. On these facts, it could easily be said that Ms. Bricker received worse treatment than Mr. Napier, since she was discharged without having engaged in any misconduct. Ultimately, neither Ms. Bricker nor any of the other women employees cited by Mr. Napier was similarly situated to him and/or treated more favorably than he. The evidence thus fails to satisfy this fourth element.

---

[4] The Court notes that, despite the Plaintiff's contention that Ms. Brothers was not qualified for the position due to her lack of experience, Mr. Napier himself had only classroom teaching experience prior to being hired into his first school administration position. Pl.'s Ex. 33 at 6.

Having failed to establish three of the four elements of his prima facie case for sex discrimination, we need not and choose not to conduct the *McDonnell Douglas* analysis. "If a plaintiff is unable to establish a *prima facie* case of employment discrimination under *McDonnell Douglas*, an employer may not be subjected to a pretext inquiry." *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 327 (7th Cir. 2002). Plaintiff's proof would not succeed under a *McDonnell Douglas* analysis either, opening the way to summary judgment in Orchard's favor.

### ii. *Ortiz* Standard

Although Mr. Napier has failed to put forward a prima facie case in support of his sex discrimination against Orchard, we shall engage in a discussion of the evidence pursuant to the *Ortiz* standard in an effort to determine whether, in viewing the evidence as a whole, a reasonable juror could conclude that Napier's sex was the cause of his discharge from employment.

In *Ortiz v. Werner Enterprises Inc.*, the Seventh Circuit clarified that in conducting Title VII analysis, district courts should not divide the submitted evidence into categories of "direct" and "indirect" evidence for separate evaluation. 834 F.3d at 765. *Ortiz* directs that "all evidence belongs in a single pile and must be evaluated as a whole" to answer the ultimate question of "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.* at 765–66. Importantly, the Seventh Circuit stipulated that this approach does "not concern *McDonnell Douglas* or any other

burden-shifting framework" and was, in fact, "consistent with *McDonnell Douglas* and its successors." *Id.* at 766.

Viewing the evidence then as a whole, we conclude that no reasonable factfinder could find that Mr. Napier's gender was the cause of his discharge from employment by Orchard. For all the reasons detailed above, this evidence, viewed as a whole, fails to raise any genuine issues of material fact respecting whether Mr. Napier's sex was the basis for or cause of his termination. The evidence of discrimination relied upon by Mr. Napier, primarily statements made by others, included none made by Dr. Helvie, indeed, the cited remarks actually occurred prior to her arrival on duty at Orchard. In *Crabtree v. National Steel Corp.*, the Seventh Circuit addressed whether allegedly discriminatory statements made in the workplace by other employees constitute dispositive evidence of discrimination. 261 F.3d 715, 723 (7th Cir. 2001). In *Crabtree*, an age discrimination claim, a supervisor had stated that certain employees "were too old to go with him through the millennium." *Id.* The supervisor who allegedly made these comments was not involved in making any discriminatory decision(s). The court thus excluded the evidence, holding that "[s]tray remarks made by non-decisionmakers are not evidence that the decision had a discriminatory motive." *Id.* That was true of much of the evidence under review here: the allegedly discriminatory statements were made by non-decisionmakers with regard to Mr. Napier's nonrenewal of his contract. Dr. Helvie alone, according to the evidence, with the concurrence of the Board, made the decision to discharge Mr. Napier.

Mr. Napier's reliance on the timing of his termination as an issue of material fact incorporates four underlying facts: 1) He was fired only weeks after a school meeting on

34

diversity initiatives at which Dr. Helvie was in attendance; 2) it occurred close to the time of Dr. Helvie's conversation with Ms. Brothers concerning her position being at risk of discontinuation; 3) Dr. Helvie's decision was made "abruptly," without prior investigation or separate conversations with Mr. Eble or Mr. Napier, himself; and 4) that during the time period between March 6, 2019 and March 8, 2019, Dr. Helvie's response to these developing staffing issues caused stress to Ms. Brothers, despite ultimately treating her more favorably than he was treated; she should have talked to him in the process, says Mr. Napier, in order to reach a better solution.

These reasons, jointly and severally, again fall well short of establishing suspicious timing with regard to Mr. Napier's termination. Viewed as a whole, the evidence as to the timing of his non-renewal is perhaps more convincingly considered in the context of his own undisputed breaches of trust and confidences in violation of Dr. Helvie's specific instructions. Mr. Napier relies on the coincidence of timing, but other factors pertain as well. In sum, no evidence has been presented by Mr. Napier showing any connection between Dr. Helvie's termination decision and the meeting she attended regarding Orchard's diversity initiatives. In addition, that Dr. Helvie did not conduct any investigation, including a conversation with Mr. Napier, before deciding to terminate him also does not create suspicions, given that Dr. Helvie had personally participated in the events leading up to her decision regarding his dismissal, making her personally aware of the events necessitating it. Specifically, she herself had instructed Mr. Napier to keep his assigned position review confidential but Mr. Napier failed to do so. As a result, Dr. Helvie was placed in a position of having to manage the consequences of Ms. Brothers's learning

prematurely that her position was under review. It's likely that no investigation would have been necessary but for Mr. Napier's unauthorized disclosures. This argument by Plaintff loses steam in the face of his admission that he had, by his breach of trust, given Dr. Helvie a non-discriminatory reason for his termination. Finally, Dr. Helvie's having informed Ms. Brothers that her position was likely to be eliminated as well, despite her subsequent retention as acting MS Director, does not support an inference of suspicious timing or discrimination. The timeline reflects the consequences of Mr. Napier's failure to maintain Dr. Helvie's confidence in him and supports Orchard's proffered non-discriminatory reason for his termination.

In reviewing Mr. Napier's cited instances of various women employees at Orchard whom he claims were allegedly treated more favorably than he, we have previously detailed the reasons that in our view none of them was in fact similarly situated to Mr. Napier and thus are not proper comparators. The evidence also fails to establish that the women he has identified were in fact treated more favorably.

Mr. Napier's contention that Dr. Helvie's "unusual" actions reveal the discriminatory nature of her termination decision as to him, referencing the alleged surprise expressed by various Orchard employees as well as members of the community in response to his announced discharge, lacks both evidentiary and persuasive force. Mr. Napier opines that sudden terminations of employment such as occurred with him were unusual over the course of Orchard's history, giving rise to some criticisms by others of Dr. Helvie's decision and management style. Pl.'s Resp. at 30; Napier Aff. at 5 ¶ 259. None of these assertions, however, supports an inference of gender-based discrimination. A surprised reaction on the

36

part of individuals who were not involved in or knowledgeable of the events leading up to the discharge decision does not translate into reasons showing that the termination decision were discriminatory, even if the surprise is interpreted as approval of Mr. Napier's tenure as MS Director. Whatever the historic practices were at Orchard prior to Dr. Helvie's arrival, they evince nothing in terms of proof that *her* motives in making the decision not to renew of Mr. Napier's contract nor do they provide evidence that it was a discriminatory determination based on his sex.

Mr. Napier's final contention considered here under the *Ortiz* rubric is that a genuine issue of material fact forecloses Orchard's entitlement to summary judgment, given that he has challenged the reason given for his termination as unworthy of belief, deeming it, in fact, pretextual. Dr. Helvie's stated reasons for terminating Mr. Napier were his breach of confidences and his violation of her trust based on his pre-mature, employment-related disclosures to Ms. Brothers. Mr. Napier does not dispute that he informed Ms. Brothers about his job description re-write task, prompting Ms. Brothers to speak with Dr. Helvie prior to its completion and a course of action decided on by her. Mr. Napier argues that his act of divulging information that was to remain confidential was not what actually caused Ms. Brothers (and Ms. Bricker, by extension) distress; rather, it was the fact of and the manner in which Dr. Helvie conducted the meeting with Ms. Brothers that caused her distress. When Dr. Helvie came to realize her mistake in talking to Ms. Brothers, according to Mr. Napier, she decided to place the blame on Mr. Napier. According to Mr. Napier, he was thus the scapegoat, fired to cover up for Dr. Helvie's mistakes. Even if true, this

alternative explanation for his termination has not been shown to have been in any way tied to Mr. Napier's gender.

Mr. Napier cites the email announcing his discharge to Orchard staff as evidence demonstrating that the reason for his termination was pretextual, arguing that the message and its timing were humiliating to him. We see nothing about the text of the email to be either derogatory or disparaging of him. It expressed appreciation for Mr. Napier's service and wished him good luck. It contained no reference to any misconduct. To the extent it lacked detail as to the reasons for his termination, that in fact likely, spared him embarrassment. Mr. Napier was being permitted to remain in his position until the end of the school year. Further, after the announcement was made, Dr. Helvie emphasized that the reasons for Mr. Napier's not retuning to Orchard had nothing to do with any untoward or illegal behavior on his part. Whether the timing of the email was insensitive we offer no opinion; but no matter what, it clearly fails to equate to or reveal or provide any discriminatory motive or conduct. Mr. Napier thus has failed to show that the email is evidence of pretext. Accordingly, no genuine issue of material fact exists regarding whether Mr. Napier's sex was the reason for and the cause of his termination of employment.

For these reasons, Orchard is entitled to summary judgment on Mr. Napier's gender discrimination claim.

### b. Retaliation Claim

Mr. Napier's final claim—that he was retaliated against for having engaged in the protected activity of filing suit to contest his discriminatory dismissal by denying his

application seven months later for reemployment—similarly fails to raise any genuine issues of material fact. While there is no dispute that the filing of this lawsuit constitutes protected activity under Title VII and that the rejection of his application to be rehired for the permanent MS Director position following his non-renewal was an adverse employment action, Mr. Napier has failed to raise a genuine issue over whether there existed a causal connection between his protected activity and this adverse employment action.

Mr. Napier maintains that when he applied for rehiring he was clearly qualified for the position, and that Mr. Eble's reason for rejecting his application, i.e. poor past performance, was untrue, because he had in fact performed well previously as MS Director, that Dr. Helvie's reason for firing him was false and discriminatory, and that Mr. Eble was further, in fact, unaware of the specific reason for Mr. Napier's prior termination. Mr. Napier argues that "poor past performance" is a vague reason, making it legally insufficient to constitute a legitimate, nondiscriminatory reason for Title VII purposes. Also, Mr. Napier repeats his contention that there is "extensive evidence" of Orchard's treating women employees more favorably. Pl.'s Resp. at 35.

We do not dispute that Mr. Napier undoubtedly possessed many of the requisite qualifications for the MS Director position, since he previously had occupied this post, but this fact by itself does not demonstrate that Orchard's reason for failing to rehire him was retaliatory and also discriminatory. There is a total dearth of evidence supporting Mr. Napier's theory that the rejection of his application was in retaliation for his having filed a lawsuit against Orchard, and we find no causal connection within the evidence cited by Mr.

Napier. Mr. Eble was aware, of course, that Mr. Napier had previously held this very position for which he was applying, and he knew that Mr. Napier had been let go because he did not perform up to the level expected by Dr. Helvie. Although Mr. Eble apparently had not been informed of the specifics of Mr. Napier's termination, Mr. Eble's knowledge that he had previously broken Dr. Helvie's trust was sufficient to justify his assessment that Mr. Napier's application should be rejected based on his poor past performance. The specific reason relied upon by Mr. Eble for his decision not to rehire Mr. Napier, if true, and we have seen no evidence to doubt its truth beyond Mr. Napier's argument, would be sufficient to justify his rejection for nondiscriminatory, nonretaliatory reasons, even if he was not aware of all the circumstances surrounding Mr. Napier's discharge. Since Mr. Napier has failed to proffer evidence that calls into question the veracity of Mr. Eble's and Orchard's nonretaliatory reason for declining to rehire him, we find that no genuine issue of material fact exists that would support a finding that he was illegally retaliated against.

We have previously discussed and rejected, Mr. Napier's claim that similarly-situated women employees were treated more favorably than he was. We extend this analysis to include these claims with respect to Orchard's rehiring decisions or acts of retaliation. Although Mr. Napier claims he has extensive evidence of such instances, the only woman cited by either side as being similarly situated in the rehiring context comparable to Mr. Napier also had past performance issues and was rejected in the same stage of the hiring process. Thus, she was not treated more favorably than Mr. Napier.

For these reasons, once again, no genuine issues of material fact exist that preclude summary judgment in Orchard's favor on Mr. Napier's retaliation claim.

40

**Conclusion**

For the reasons detailed above, Defendant's Motion to Strike [Dkt. 124] is <u>GRANTED</u>

<u>IN PART</u> and <u>DENIED IN PART</u>, and Defendant's Motion for Summary Judgment [Dkt. 103] is <u>GRANTED</u>. Final judgment shall be entered accordingly.

　　　IT IS SO ORDERED.


Date:　　___3/7/2023___　　　　　　　　　　_Sarah Evans Barker_

　　　　　　　　　　　　　　　　　　　SARAH EVANS BARKER, JUDGE
　　　　　　　　　　　　　　　　　　　United States District Court
　　　　　　　　　　　　　　　　　　　Southern District of Indiana

Distribution:

Jessica L. Billingsley
CHURCH CHURCH HITTLE & ANTRIM (Noblesville)
jbillingsley@cchalaw.com

Richard L. Darst
COHEN GARELICK & GLAZIER
rdarst@cgglawfirm.com

Alexander Phillip Pinegar
CHURCH CHURCH HITTLE & ANTRIM
apinegar@cchalaw.com